The Honorable Judges of the United States Court of Appeals pending before the 7th Judicial Circuit. Hear ye, hear ye, hear ye. All persons have a witness. The court is now seated. God save the United States and this Honorable Court. Please be seated everyone. Our first case for the morning is Uetricht v. Caterbeck v. Chicago Parking Meters, LLC, No. 22-11-66. Mr. Gager. Thank you, Your Honor. Good morning. May it please the Court. Plaintiffs challenged the right of dependent CPM to run the Chicago Parking Meter system as a private concession, as a private monopoly for 75 years. This is a monopoly. It is a violation of the Sherman Act and it does not meet either of the two stringent conditions for a Parker exemption to liability. Why exactly is it a monopoly? It is a monopoly, Your Honor. Yes. I mean, you can say that. I heard you the first time, but why? And the district judge ruled in our favor on it. It's a monopoly because everyone has to use the Chicago Parking Meter system sooner or later who has a car in the city of Chicago, unless they have a garage. It meets the standard definition of monopoly in that there is no substitutability in the long run. Sooner or later, you've got to pay to CPM. And the second is that there are excessive barriers to competition and new entrants. This is a 75-year agreement. For these particular parking places, I'm sure that, I'll assume that you're right about that. Before, I mean, I'm dubious that it's a monopoly. Your opponents indicate that there are many, many other ways of parking within the city of Chicago. Now, in a particular spot on a particular street, you might be in an area where Chicago Parking Meters has it, but there are many other options. But putting that to one side, what is it in the Parker versus Brown universe, which includes Town of Holly, that says that municipalities may not fulfill a government function by contracting with an outside provider? I think that a municipality can contract with an outside provider under two conditions. First of all, there's not a violation of the Sherman Act. There's not a private concession. That's a circular argument. I'm trying to figure out how far you think the Parker exemption goes. Yes. And there has to be active state supervision. There has to be affirmative state authorization of this. This is an 11th Amendment defense. It is applicable to the states. And there has to be specific state authorization of this function. 11th Amendment? It's partly based on the 11th Amendment. I mean, I know Parker against Brown quite well, as I think the other members of the And what it says is that Congress would have been much more clear if it had meant to displace this much state regulatory authority. And so the court signals, in a legislative interpretation sense, concern about how far this goes. And they say, instead of the usual preemption that you would find from a federal statute over conflicting state statutes, they're actually going to say there's a zone that the Sherman Act was never intended to cover. And that's the zone where state action is involved. Now, as you know, under MIDCAL, state action is usually requiring active or clear authorization and active supervision. But under HALLE, the active supervision part isn't there. So that takes me to your reading of the ordinance, where you think it deals only with off-street parking. And I find that a somewhat strained interpretation. We're arguing that that statute does not apply to off-street parking. I know you are. Yes. Well, Division 71, let's put aside, Judge, that the Division 71 heading says off-street parking. I understand. And let's put aside that the reference to parking meters is not explicitly on-street, as opposed to off-street parking. It doesn't say one way or the other, does it? It just says parking meters. But paragraph A speaks only of the direct operation and management ownership of the off-street parking facilities by the city, by the municipality. And the judge, the district court judge, was correct in deciding that that paragraph doesn't authorize this deal. But the district court relied upon paragraph C, which says that the city can contract in any manner with respect to the purposes of Division 71. Well, Division 71's purposes are laid out in Section A, and the judge district court agreed that Section A doesn't apply, so Section C doesn't get them anywhere. And the standard under the Supreme Court case law is that these policies have to be clearly articulated. A general grant of authority to enter a contract is not good enough. Phoebe Putney, FTC versus Phoebe Putney, if I can say that correctly, too many Ps, really set out a very high standard. It's not just enough that the— You didn't even mention Phoebe Putney or North Carolina State Board of Dental Examiners. And I went back and looked at the briefs before the district court, and it didn't seem like you focused on those two cases below. Well, we did focus. We didn't cite North Carolina Board of Examiners, but we did say that the Parker exemption didn't apply for the two reasons that it didn't. We really argued the mid-cal. Because the Board of Dental Examiners seems very relevant here. I was surprised that you're arguing that for the first time. Phoebe Putney, yes, it is very relevant. And the North Carolina case. Yes, but it's fairly clear on its face that there is no statutory authorization for this on-street, for this monopoly for a 75-year period. So we just— Suppose it were just five years. Well, if it were five years, it might not be a restraint of trade within the meaning of Section 1. You know, antitrust law is about not formalism. It's about the economic reality. That's what we're hearing. And we have alleged that the city has no effective control over this. It's not able to regulate it. So how can you say that when the city has reserved quite a bit of regulatory control? The city has created another 1,800 parking spaces. It's changed the number of parking spaces over the year. It controls the fees. That doesn't sound like nothing to me. Maybe it's not enough. But it sounds as though the city has reserved quite a bit of regulatory authority. Well, formally, it's reserved all sorts of power. But that's a technical reservation. To make major changes in this agreement, to cut the rates, to eliminate a large number of parking meters, the city would have to pay far more than it's now paying, which is $28 million. I understand. And if the city goes too far, as the agreement sets out, CPM can use the nuclear option. If the city acts so as to reduce 25 percent or more of the value of the agreement, CPM can trigger the termination and ask for payment of the whole monopoly profit for a 75-year period. But can I ask you? That's billions of dollars. I understand it's a lot of money. Billions of billions. But I guess I'm a little worried about the incentive on the other side. When an entity, here the city of Chicago, enters into a contract, if it has reserved the right to break the contract whenever it wants to, then the contracting party isn't going to pay as much, is not going to find the contract particularly useful. And you seem to think that the city needs to be able to breach. No, not at all. Ordinary contracts can have penalties upon them and damages and so forth. But we're talking about a Sherman Act violation. We're talking about a concession to take money from the public over a 75-year period, a concession that is not only allowing them to take money, but billions and billions of money from the public. Parker exemption is different from what may be required under state constitutional law. If you are in the antitrust box, you have the burden, as a private party, of showing that you are meeting the Parker exemption. You may not like the Parker exemption. You may think that the city should have more flexibility. But the Supreme Court's interpretation of this, and the Supreme Court, I think it's fair to say, Your Honor, really dislikes the Parker exemption. The Supreme Court does base this partly on the 11th Amendment. And the Supreme Court has said that this is not applicable to private parties especially. And there are strict conditions. I think that's overly simplistic. I don't think the Supreme Court has forbidden, to go back to my first question, cities or municipalities, or for that matter states, from contracting with private entities to fulfill. I mean, you can have a contract with a garbage collection company. You can have a contract with parking people. You can have a contract, you know, in many respects, you know, people to clean up the parks. You know, you have many contracts. Of course. Service contracts are perfectly okay where the city is directing the function where it's under city control. But this is not a service contract. This isn't fixing the plumbing. So you are focusing on whether enough authority has been reserved by the city. And you think there's a per se rule that a 75-year contract will never suffice. No, there is no per se rules in antitrust law. We are here on a… That's not true. Don't go there. Except in one instance, which is, you know, specific combinations under Section 1. Everything else is fact-based. So the fact… And the fact-based here is that both under Section 2, there is a monopoly, a turning over of the public function. They have the burden, Your Honor. And it is a heavy burden to show that they meet both of the two Parker exemptions. First, that there is clear authorization. And Division 71 doesn't get you anywhere. And let's put aside the heading of it. And let's put aside the fact that there's no explicit reference to on-street parking. It doesn't get you anywhere. And it's a stretch to say that this is a clear, affirmative expression of state policy in favor of this private monopoly for 75 years. So that's number one. They're out on that. Number two, the city, as a matter of fact, as economic reality, doesn't have the power to get out of this deal. You know, every politician in the city. Mr. Gagin, could I ask you about that? Yes. I take it there's no challenge here to the integrity of the contracting process? There is no challenge. That's not before the court. That's come up in some other cases. Yes, we understand. Okay. But this is… Has the city weighed in at all? I didn't see anything at the district court. Has the city weighed in at all on its view on this? No, it has not. I believe that there is some obligation on the city's part to come in and assist CPM. I'm not sure of that, but it's not here in the case, and we didn't sue the city. Could a citizen of the city… Let's suppose there's no contract. The city's just operating parking meters itself. Is there anything that would allow a citizen to sue the city for monopolizing its parking meters? No, not at all, because I think that the city has that power under state law that goes back to the 19th century before there were even cars. You know, we cited provisions that say the city has the right to regulate the streets. Fine. But that is not a provision… We've got Part 71, and we've got the explicit invitation in the Illinois statutes, in essence, to exploit the Parker v. Brown exception to its limits, right? That's not the kind of specific approval that the Supreme Court requires. No, they work in combination. But the state law clearly allows the city to run its own set of parking meters, right? That's true. But there's no clearly articulated state policy in favor of this. In fact, one might say that even imagines something like a 75-year private monopoly over the city. Oh, that's why we go back to the length. Yes. And the contracting out to the contracting out itself, even on a short-term basis. You don't think that's authorized, even on a short-term basis? We do not, no. That doesn't mean it's an antitrust violation, but I think it could be challenged because there's no explicit reference in those ancient state laws that are still applicable here to on-street parking that says that the city can enter contracts to turn the function over to a private entity. Now, it may be that there's no effective antitrust violation if it's for a short period, two or three years, or the city has reasonable control over it and so forth. Nobody would bring the suit. But here, it's all about the facts. And the economic reality is that the city has lost effective control over this. The profit involved here is billions and billions of dollars which the city would have to pay to get out of this or to reduce the rates in any significant way. There are nuclear options in this that CPM can use to keep the city from doing that. It is an antitrust violation because there is no alternative for people of this city. Sooner or later, everybody has to go and pay money to CPM if they have a car in this city and take it out of the garage on some sort of regular basis. So that is the essence of a monopoly. There are rigid barriers to new entrants to rebidding for 75 years, for 75 years. And there's just simply no state authorization for this. They have the burden of showing that there's... I think we have your point. Do you want to save the rest of your time for rebuttal? Yes. Thank you. All right. Thank you, Mr. Kagan. Ms. Koberly for the defense. Good morning, Your Honors, and may it please the Court. This case challenges an exclusive contract that the city granted under clearly articulated state authority. The challenged act is an act of the city itself, and it's immune from the antitrust laws. And the plaintiffs can't avoid that immunity simply by naming the contracting party in the lawsuit. What about the fact that given the 75-year duration, there isn't going to be competition for this contract for a long time? You think back to some of the cable TV cases, the communications in Boulder, and the thing that saved the exclusivity of the contract was that every five years or every three years or whatever it was, enough time to invest in the contract, there was an opportunity to rebid. Whereas here, I guess we still have 61 years to run or some lengthy time like that. There really isn't competition for the contract. What about that? I think that's true that because of the length of time, there's not competition for the contract. But the question under Parker and MidCal is whether the city had clear authority to enter into a contract like this one. And the answer is yes. So do you have anything other than Section 1171-1A, acquire parking meters, and then C, enter into contracts? That's your whole case, right? Well, and the statute that contemplates that it's the policy of the state that all powers granted to the municipalities are to be interpreted to include reasonably foreseeable anti-competitive acts. So it's the Section 10, the part that recognizes the state's immunity doctrine. But if you think about public-private partnerships in general, there's nothing unforeseeable about them being long. This particular statute, Section C of the statute, which we've been talking about this morning, doesn't impose a limit on contract duration. And if you look at other provisions in the Illinois Code that do impose contractual limits on municipal contracts, they're very, very long. Our brief cites the statute for water supply contracts, which are not to exceed 101 years. Our brief also cites the statute for the real estate leases, for real estate leases which are not to exceed 99 years. And the Skyway has a 99-year operating lease. So there's nothing particularly surprising about the fact that a city contract, exclusive city contract with a private contractor would be long in duration. That's the only reason that they make sense. Ms. Colbert, you started out by saying that this was challenging an act of the city itself. But the way the complaint is pled, it focuses on CPM's essentially de facto power, that this is an act of CPM, although the city contracted with it, given the penalty provisions and the other provisions in the contract, it's a private actor that has control over this. So how do you respond to that, which would take it out of a municipality acting alone? Well, I think to respond to your question, Your Honor, I'm going to refer to the North Carolina dental case, which Your Honor's question mentioned earlier. So the North Carolina dental case was a challenge to an act by a private board. There was a private board created by the state. The board was to regulate dentists, including all kinds of things that affected price and output. And the plaintiffs in that case filed an antitrust challenge to an act of the private board under its authority. So they were pointing to price fixing by the private board. Here it's very clear in the complaint and in all the briefing and in the argument this morning that the challenge is to the CPM agreement itself. It's not just something CPM did. But that's not the way the complaint is read. The agreement is part of it, but it's the actions of CPM given de facto what happens under the contract. So I'm not sure I agree. The penalties, the provisions in the contract, the way I read the complaint, the hefty provisions in the contract essentially take away the regulatory authority of the city. And so it is CPM's actions. But it's the contract that does that. It's not CPM that did that. It's a contract that did that, and the contract was signed by the city. It was created by the city. It was put out for bid by the city. This whole concept came from the city. CPM happened to be the successful bidder in the process. But why wouldn't CPM be the actor in it then that's focused on? Well, because this is a challenge to the contract that contains the provisions that Your Honor was mentioning, and a contract has two signatories. The contract itself is an act of the city, and it's also an act of the private party. And we've cited cases from many other circuits. This court hasn't squarely addressed the issue. But we've cited cases from many other circuits that deal with this issue, and they unanimously hold that when you have a challenge to a government contract, the terms of a government contract, the city itself, there's no dispute that they couldn't bring this lawsuit against the city. They can't get around the city's authority and the immunity that impacts this contract simply by naming the other side of the contract. So in essence, what they're doing is just trying to evade the authority by artful pleading, and the cases, all the cases from the other circuits that have dealt with this issue say that that's not permissible. So the other issue I wanted to mention is about this idea of power not being actually in the hands of the city, and the complaint itself defeats that. So the theory I heard today was it's too cost prohibitive for the city to do anything. Well, that's right. The city, in order to true up, has to pay so much money per parking place. If the city decides in a burst of interest in climate control that it wants to have instead of 36,000 parking places only 25,000 parking places, it would be prohibitively expensive for the city to recapture the extra ones from you. But the complaint says that, and we heard that this morning as well. Right. Why isn't that right? Well, and it is expensive, right? That's the deal the city chose to strike. But paragraph 33 of the complaint itself concedes that in 2019, in just one year, the city was required to pay $27 million in true up payments because to compensate CPM for use of the city's reserve powers. In other words, the complaint itself, paragraph 33 of the complaint itself, concedes that the city has exercised its reserved powers. And it may be a deterrent, the cost provisions may be a deterrent, but they're not an effective one because the city actually did exercise its reserved powers. That direction sounds an awful lot like factual nuances are going to be relevant, however. Can I ask you, Ms. Cobley, to address the Phoebe Putney opinion from the Supreme Court, and in particular the caution from the court that the Court of Appeals, at least in that case, had read the foreseeability requirement too loosely with respect to the question of state authorizing policy. Well, so the Phoebe Putney case was about a state-created authority that was to manage hospitals, and then that authority started making anti-competitive acquisitions. And there wasn't anything specifically that authorized that kind of action, those kinds of anti-competitive acquisitions. Here we have a couple of statutes, and if I can just walk through the steps. So Section A of the statute that we've all been talking about is the one that recognizes and gives the city a monopoly over parking meters. We all agree, I think, that the city has a monopoly over parking meters that it owns in public places. Section C gives the city the power to enter into contracts dealing in any manner with the subjects of Division 71. So A grants the city a monopoly. C gives the city the ability to enter into a contract with a private operator to operate its monopoly. And then, of course, we have the other provision that I mentioned, in which the Illinois legislature recognized that all grants of authority to municipalities should be interpreted in a way that makes clear that they contemplate anti-competitive activity. So when you put all three of those together, that's a very different kind of authorization than what was before the court in Phoebe Putney. I do want to return just for a second to what Your Honor, I think, correctly recognizes, the factual issue of the city's actual control and the ability to exercise the reserved powers. I agree that it's factual, and that's why I cited the complaint. So the complaint itself concedes that the city has exercised its reserved powers. And we also have a court finding on that issue. Well, and the city has changed the rates, hasn't it, over the years? Yes, and the city has also called for the creation of bike lanes all over the loop. We can see them when we walk outside today. There's all kinds of changes that have occurred. And, in fact, this true-up process, it's all a matter of public record. The way it works is the city council will create an ordinance that calls for some change about where parking places are going to be, what the hours are going to be, whatever. And then there's an ordinance. It's all a matter of public record. And then there's a true-up calculation that occurs, and then money moves both ways, actually. Sometimes a payment is made to CPM. Sometimes CPM gives a credit to the city. So the true-up provision actually runs both ways. And it's simply a way to recognize that the city does reserve the power to make decisions that will change the overall value proposition of the asset or the value that CPM contracted for. So is your bottom line about the plaintiff's case just that, unfortunately, the city cut a very bad deal for itself back when it decided to contract with CPM? Well, we don't think it was a bad deal. It wasn't for you. It won't surprise you to hear me say that we don't think it was a bad deal. It's provided critical funding to the city, and it's created tremendous improvements in the on-street parking system, which we can see if we walk outside today. But if it was a bad deal, that's a political problem. That's not an antitrust problem. And there's already been a challenge to this contract in the Illinois courts, and that challenge failed. The district court here concluded that the plaintiffs don't do any better under the antitrust laws, and the court was exactly correct in doing that. And, by the way, it's that district court, it was that decision that gave the court finding that I mentioned a moment ago about the reserved powers. In assessing this contract and deciding that case, the first district held that the city, and I'm quoting, the city has, in fact, exercised its police powers to make changes to the metered parking system for the benefit of the public, notwithstanding the concession agreements compensation problems. That's Independent Voters v. Ahmad, 1st District, 2014. So this is not a factual issue. This is a pleading stage issue. But the biggest question that your opponents are raising is whether those three things to which you point, AC and the General Parker comment, are enough to satisfy the town of Halley standards about the precision of the authorization that has to be coming from the state before the rest of these consequences start flowing. And that surely is a question of law for us to evaluate, and we have Phoebe Putney in cases saying don't get carried away with this. You know, it's a big deal to allow state law to displace the general principles of federal antitrust law. I think the monopoly recognized in Section A takes care of that because it is a big deal. But there's no dispute. In fact, my friend did not dispute that the city has a monopoly over parking meters in Chicago. So if the city wanted to charge you instead of whatever it is, $4.50 an hour to park up in Streeterville, the city could say, no, it's going to be $15 an hour. Absolutely. It might be a bad idea. There might be a hue and cry and a political outrage, but it's not an antitrust problem. And because of Section C, we know that the legislature intended that a private operating contract could be created. And these are all the cases that we've cited in our brief from the other circuits, the second, the sixth, the eighth, the ninth, all of which have recognized that when you have a lawsuit that challenges an exclusive operating contract or service contract or something like that, you can't evade the immunity that attaches to that government contract just by suing the other party. But don't the cases make clear that it's different for the city to have this monopoly because of the political process and that there is a way to keep it in check? And that's why the immunity extends to municipalities because they can be checked through this process, whereas a private entity like your client doesn't have that type of check? Well, I think there's a, if I can quote the Sixth Circuit in the Michigan Pays Hell case, they talk about this in a way that I think really crystallizes it. The basic, and I'm going to quote, the basic question in antitrust cases that involve municipal and private actors is whether the municipality or the private party, regulated party, made the effective decision that resulted in the challenged anticompetitive conduct. Here, the challenged anticompetitive conduct is the contract that gives Chicago parking meters a 75-year monopoly in operating the parking system. That's the challenged conduct. There's no allegation here that anything Chicago parking meters did on its own, that any particular pay-to-park machine or price that it charged or anything like that was anticompetitive. That's not the claim. The claim is that the contract that the city and CPM together entered into is anticompetitive because it's too long, et cetera. I think we have your views. Any final thought? No, thank you for your time. Thank you. Mr. Gagin, rebuttal. Yes, plaintiffs could have sued the city. We just didn't. And they didn't even plead them. The CPM is, and the city, entered in a legal agreement that can't be justified under the Parker exemption. And do you agree that the contract is the challenged conduct here? The conduct and the implementation of the contract, the collection of money from the public, billions and billions of dollars, yes. That's all part of the antitrust violation. And the city is just as much on the hook. Yes, the city has from time to time, year to year, paid $28 million, $30 million a year for modest changes in the parking meter system. These are modest changes. And it is extremely deterred factually from doing anything more, including putting in more bus lanes, bike lanes, but also removing meters, having street fares. What about the additional 1,800 spaces the city has created that are not under this contract? Couldn't it do more of that? If and only if it didn't reduce the profitability of CPM. Your Honor, everything that the city does, any regulation of the streets in public ways, has to begin with a calculation. How much is this going to cost the city? Which is a very indeterminate calculation because it may end up in arbitration. And whether the city has enough money in its budget to pay off CPM to do this. Now, it could raise the meter rates and it might owe money to CPM if that deterred the use of meters. Everything the city does, up, down, sideways, requires a calculation as to what it's going to cost. The true up payments that Your Honor is talking about are modest changes. Big changes, and certainly getting out of the agreement, is billions, billions, billions of dollars. It's an incalculable sum for the rest of the century or most of the rest of the century. And as far as the authorization, we are talking about a statute after all that applies only to off-street parking. That's the reality. You're back to your title. And there is no affirmative contemplation of this anywhere in any state law. Thank you. Thank you, counsel. The case is taken under advisement.